JUDGE DANIELS

07 CV 6384

338-07/GMV/PLS

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 0335)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x

EGYPTIAN NAVIGATION CO.,

Plaintiff

-against -

WAKALEX IMPORT & EXPORT CO. a/k/a
WAKALEX IMP/EXP CO. a/k/a
WAKALEX IMPORT and EXPORT CO.,

Defendant.

-----------------------------------------------------------------x

**VERIFIED COMPLAINT**

Plaintiff EGYPTIAN NAVIGATION CO. ("ENC") by its attorneys Freehill Hogan & Mahar, LLP, as and for its Verified Complaint against Defendant WAKALEX IMPORT & EXPORT CO. a/k/a WAKALEX IMP/EXP CO. a/k/a WAKALEX IMPORT and EXPORT CO. ("WAKALEX"), alleges upon information and belief as follows:

1. This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract by Defendant WAKALEX. The case also falls within the Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333. Jurisdiction is also proper pursuant to the Court's federal question jurisdiction under 28 U.S.C. §1331. Federal jurisdiction also exists because the

action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2. At all times relevant hereto, Plaintiff ENC was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 2, Elnasr St., Elgomrok, Alexandria, Egypt.

3. At all times relevant hereto, Defendant WAKALEX was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at KM 10, Alexandria-Cairo Agricultural Road, P.O. Box 23, Abbis, Alexandria, Egypt.

4. On or about May 17, 2007, Plaintiff ENC, as owner, and WAKALEX, as charterer, entered into a maritime contract of charter party for the carriage of a 5,400 metric tons of bulk sugar beet pellets from Damietta, Egypt to Jort Lasfer, Morocco onboard the M/V ALEXANDRIA (hereinafter "charter party"). A true and correct copy of the charter party is attached as Exhibit A.

5. The bills of lading for the cargo identified Defendant Wakalex as the shipper of the cargo, Banque Populaire Casablanca as the consignee and Dynacome SARL ("Dynacome") as the notify party.

6. After loading at Damietta, Egypt, the vessel proceeded to the discharge port of Jort Lasfer, Morocco.

7. Under the terms of the charter party, Wakalex bore responsibility for the loading, stowage and discharge of the cargo.

8. At Jort Lasfer, Dynacome lodged a claim before the Moroccan Court for an alleged shortage of 200 tons of sugar beet pellets, (a claim for which Wakalex is liable under the charter) which led to the arrest of the vessel.

9. ENC was forced to provide security in the amount of $37,000 and €6,000 to Dynacome to secure the release of the vessel.

10. ENC has suffered losses and/or is exposed to damages and expenses, all of which are the responsibility of Wakalex, consisting of the following: (i) posting of a bank guarantee of $37,000 and €6,000 to obtain the release of the vessel from arrest and as security for expenses, (ii) delay of the vessel as a result of its arrest for a period of three days and loss of freight in the amount of $31,5000; (iii) costs and fees to obtain the release of the vessel in the amount of $10,000; and (iv) costs and fees in connection with the London arbitration and these proceedings.

11. This action is brought to obtain jurisdiction over Wakalex and to obtain security in favor of ENC in respect of its claims against Wakalex and in aid of the London arbitration proceedings.

12. This action is further brought to obtain security for any additional sums to cover ENC's anticipated attorney fees and costs in the arbitration and interest, all of which are recoverable as part of ENC's claim against Wakalex under English law.

13. Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable as part of ENC's claim.

14. The charter party contains clauses calling for the application of English Law with London Arbitration, and ENC specifically reserves its rights to arbitrate the substantive matters of the dispute.

15. Plaintiff ENC has fulfilled all obligations required of it under the charter party.

16. Plaintiff estimates, as nearly as can be computed, that the legal expenses and costs of prosecuting the London arbitration will be $30,000 and interest on its damages in the London

proceedings are estimated to be $10,965.98 (calculated at the rate of 6% for a period of two years, the estimated time for completion of the arbitration in London).

17. Upon information and belief, and after investigation, Defendant WAKALEX cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant WAKALEX (collectively hereinafter, "ASSETS"), including but not limited to ASSETS as may be held, received, or transferred in either of its names or for its benefit at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

WHEREFORE, Plaintiff ENC prays:

a. That process in due form of law according to the practice of this Court issue against Defendant WAKALEX, citing it to appear and answer the foregoing, failing which a default will be taken against it.

b. That if Defendant WAKALEX cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendant WAKALEX, up to and including the claim of **USD $127,658.62** be restrained and attached, including, but not limited to any cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendant WAKALEX (collectively hereinafter, "ASSETS"), including but not limited to such ASSETS as may be held,

received, or transferred in either of its names or as may be held, received or transferred for its benefit, at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That this Court retain jurisdiction over the matter for any further or supplemental proceedings as may be necessary, including but not limited to the recognition and enforcement of any judgment entered against the Defendant in the London proceedings; and

d. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
July 12, 2007

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
EGYPTIAN NAVIGATION CO.

By: [signature]

Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 0335)
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax

**ATTORNEY VERIFICATION**

STATE OF NEW YORK )
) ss.:
COUNTY OF NEW YORK )

PAMELA L. SCHULTZ, being duly sworn, deposes and says as follows:

1. I am an associate with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

PAMELA L. SCHULTZ

Sworn to before me this
12 day of July, 2007.

Notary Public

Lisa M. Morales
Notary Public, State of New York
No. 01MO6162004
Qualified in the Bronx
Commission Expires Feb. 26, 2011

29 Jun 2007 17:01 HP LASERJET FAX p.3

| 1. Shipbroker<br>TRANSOCEAN MISR SHIPPING & TRADING<br>CAIRO - EGYPT<br>TRANSOCEAN MISR<br>CAIRO | RECOMMENDED<br>THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 AND 1994)<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: "GENCON"<br>ORIGINAL<br>Part I |
|---|---|
| | 2. Place and date<br>CAIRO – 17th MAY 2007 |
| 3. Owners/Place of business disponent Owners<br>EGYPTIAN NAVIGATION CO. (E.N.C.)<br>ALEXANDRIA - EGYPT | 4. Charterers/Place of business (Cl. 1)<br>WAKALEX IMPORT & EXPORT CO.<br>ALEXANDRIA – EGYPT. |
| 5. Vessel's name (Cl. 1)<br>M/V "ALEXANDRIA" | 6. GT/NT (Cl. 1)<br>9533 / 6623 |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1)<br>12800 MTONS | 8. Present position (Cl. 1)<br>TRADING |
| 9. Expected ready to load (abt.) (Cl. 1)<br>24 – 28 MAY 2007 | |
| 10. Loading port or place (Cl. 1)<br>1 GSPB DAMIETTA – EGYPT AAAA | 11. Discharging port or place (Cl. 1)<br>1 GSPB JORF LASFAR – MOROCCO AAAA |
| 12. Cargo (also state quantity and margin in Owners' option. If full and complete cargo not agreed state "part cargo") (Cl. 1)<br>MIN/MAX 5400 MTS BULK SUGAR BEET PULP PELLETS S.F. ABOUT 1,7 CBM WOG.<br>Holds To sealed By A.G.S.A.I damietta and To Defer By A.G.A.I [illegible] | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)<br>SEE CLAUSE NO. 21 | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4)<br>SEE CLAUSE NO. 21 |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6)<br>WAKALEX IMP.&EXP. CO. ALEXANDRIA | a) Laytime for loading |
| 18. Agents (loading) (Cl. 6)<br>OWNERS AGENTS | b) Laytime for discharging |
| 19. Agents (discharging) (Cl. 6)<br>CHARTERERS AGENTS | c) Total laytime for loading and discharging<br>TOTAL 7 WWDAYS SEE CLAUSE 23 |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)<br>USD 5000 PD PR / FREE DESPATCH | 21. Cancelling date (Cl. 9) |
| | 22. General Average to be adjusted at (Cl. 12)<br>LONDON |
| 23. Freight Tax (state if for the Owners' account) (Cl. 7)<br>OWNERS ACCOUNT | 24. Brokerage commission and to whom payable (Cl. 15)<br>3,75% ON FREIGHT/DEADFREIGHT&DEMURRAGE |
| 25. Law and Arbitration (state 19 (a), 19 (b), 19 (c) of Cl. 19; if 19 (c) agreed also state place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19)<br>ENGLISH LAW TO APPLY AND ARBITRATION IN LONDON | |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | 26. Additional clauses covering special provisions, if agreed<br>FROM 20 TO 41INCLUSIVE ARE PART OF C/P |

Copyright published by The Baltic and International Maritime Council (BIMCO), Copenhagen

It is mutually agreed that this contract shall be performed subject to the conditions contained in this charter party which shall include Part I as well as Part II. In the event of conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| Nadia [signature] | [signature] |

Printed by BIMCO The Charter Party Editor

EXHIBIT A

PART II

# "Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 she may safely get and lie always afloat, and there load a full and complete cargo responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or stated in Box 11 as ordered on signing Bills of Lading, she may safely get and lie always afloat, and there deliver the cargo.

2. Owners' Responsibility Clause
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. Deviation Clause
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. Payment of Freight See clause no. 23
intaken quantity of cargo.
(b) *Prepaid.* If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost.
Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.
(c) *On delivery.* If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.
Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to

5. Loading/Discharging
*(a) Costs/Risks*
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
*(b) Cargo Handling Gear*
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage.
On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
*(c) Stevedore Damage*
The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. Laytime See clause no. 23
The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
* *(b) Total laytime for loading and discharging*
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
*(c) Commencement of laytime (loading and discharging)*
Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall count.
* *Indicate alternative (a) or (b) as agreed, in Box 16.*

7. Demurrage
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

8. Lien Clause
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. Cancelling Clause
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.
The provisions of sub-clause (b) of this Clause shall operate only once, and in case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

10. Bills of Lading
Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

11. Both-to-Blame Collision Clause
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

12. General Average and New Jason Clause
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).
If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery.".

13. Taxes and Dues Clause
(a) *On Vessel* -The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed.
(b) *On cargo* -The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed.
(c) *On freight* -Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the account.
owners

# PART II
## "Gencon" Charter (As Revised 1922, 1976 and 1994)

**14. Agency**
In every case the Owners shall appoint their own Agent [illegible] at the port of loading and the port of discharge.

charterers agent at

**15. Brokerage**
A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24.
In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latter's expenses and work. In case of more voyages the amount of indemnity to be agreed.

**16. General Strike Clause**
(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.
(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.
(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

**17. War Risks ("Voywar 1993")**
(1) For the purpose of this Clause, the words:
(a) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.
(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement.
(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien on the cargo for such expenses and freight.
(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route.
(5) The Vessel shall have liberty:-
(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions;
(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;
(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;
(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;
(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions;
(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route.
(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage.

**18. General Ice Clause**
*Port of loading*
(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void.
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter Party.
(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port.
*Port of discharge*
(a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination.
(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge.
(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

**19. Law and Arbitration**
* (a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final.
For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association.
* [illegible] Title 9 of the United States Code and the Maritime Law of the United States and should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of Maritime Arbitrators, Inc..
For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc..
* (c) Any dispute arising out of this Charter Party shall be referred to arbitration at the place indicated in Box 25, subject to the procedures applicable there. The laws of the place indicated in Box 25 shall govern this Charter Party.
(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply.
* *(a), (b) and (c) are alternatives; indicate alternative agreed in Box 25.*
** *Where no figure is supplied in Box 25 in Part I, this provision only shall be void but*

**M/V " ALEXANDRIA "**
**RIDER TO THE CHARTER PARTY DATED 17th. MAY 2007**

---

**CLAUSE 20 :**
**Vessel MV ALEXANDRIA – Egyptian flag -sid – built 1991 – grt/nrt/dwt : 9533/6623/12800 mtons - Loa / breadth / draft : 132.90/20.50/9.46 mtr. – grain/bale : 20805 / 19390 cbm – ho/ha : 4 / 4 – cranes: 2 x 10 + 2 x 20 + 1 x 10 t.**
**Class : Lloyds Register of Shipping ( LR )**
**P&I club : The American Club – NEW YORK , USA .**
**All details about .**
**-Present cargo : steel**
**-Owners guarantee that :**
**Vessel is steelfloored**
**All ship's gears are in good working order and can be used at discharging port**
**Vessel is suitable for grab discharge**
**Vessel is eligible for this trade**
**Vessel shall remain covered with same P&I club and hull underwriters during The performance of this voyage.**
**Vessel is ISM fitted and ISM regulations compliant**

**CLAUSE 21 :**
Freight USD 33,00 per metric ton free in and out , stowed and trimed Payable 100pct less commission (3,75%) to owners nominated bank by swift Transfer within five working banking days from signing and releasing BS/L marked "FREIGHT PAYABLE AS PER C/P" . Any how before breaking bulk . Freight deemed earned on signing bills of lading discountless , nonreturnable , vessel and or cargo lost or not lost . For "CLEAN ON BOARD " Bills of lading , Master has the right to reject any cargo which could be damaged and Charterers/Shippers to replace same with sound cargo . Other wise any remarks to be inserted in the mates receipt & the Bills of Lading to issued in strict conformity in the mates receipt .

**CLAUSE 22:**
Loading and discharging ports :
Loading port : 1 GSPB DAMIETTA , EGYPT AAAA
Discharging port : 1 GSPB JORF LASFAR – MOROCCO AAAA

**CLAUSE 23 :**
Cargo to be loaded and discharged at the rate of total 7 weather working days of 24 consecutive hours . At loading port Fridays and holidays to be excluded even if used

**CLAUSE 28:**
Owners agents at loading port
And Charterers agents at discharging port : 'COMPAGNIE : AGEMAFRIC –
JORF LASFAR . for attn. Mr. Tazi Samir
TEL : +212 22 317 258 / 317 336
FAX: +212 22 310 774
GSTL:+212 61 325998
E-MAIL: gemafric@iam.net.ma

**CLAUSE 29:**
Over time , if any , at loading and discharging ports to be for account of the party
ordering same , but Crew's and Officer's overtime to be always for Owners account .
Overtime , if any , ordered by port Authorities to be always for
Shippers/Receivers/Charterers account .

**CLAUSE 30:**
Vessel to provide sufficient light for night work if required in and/or on deck .

**CLAUSE 31:**
Cargo to be loaded stowed and trimed/ under deck only and as required by Master ,
however cargo not to be loaded into compartments obstructed by stanchions , posts or
other obstructive and while are not easily accessible to derricks/forklifts/trucks .
Charterers/Shippers have the right to use forklifts trucks in vessel's holds for loading
and discharging the cargo up to vessel's permissible tank top strength .

**CLAUSE 32:**
Stevedores although appointed and paid by shippers / receivers shall work under
Master's direction and supervision . Any stevedores damages to be reported by Master
immediately or by latest within 24 hours on occurrence/discovery to stevedores/agents
and to shippers/receivers and also to charterers. In case owners unable to obtain any
settlement form party causing damage , after having used all due diligence , the
charterers to use all their influence on such party for correct settlement .

**CLAUSE 33:**
Upon giving definite written notice of readiness , vessel's holds to be clean , dry and
swept , free of smell , insects , odor , rust or residues of previous cargoes and fit to
load the cargo up to independent surveyor satisfaction . Independent surveyor to be
appointed and paid by the Charterers. Otherwise failing of holds inspection time not
to count from time vessel's holds rejected by said surveyor till reacceptance by said
surveyor .

**CLAUSE 34:**
Charterers are fully responsible for the type , quality , condition of the cargo . Any claim regarding type , quality , condition of the cargo , Charterers must cover the Owners immediately for such claim .
Any craft paper and/or nylon sheets or wood required for loading and stowed the cargo to be for Charterers account .

**CLAUSE 35:**
Opening and closing hatches in loading and discharging ports to be effected by the crew , if same not permitted by local regulation authorities , same to be for Charterers account. The Master shall close or cover the hatches when weather is wet or threatening unless other wise ordered by Charterers , as well as after finishing loading/discharging , every day , and also to open same prior to resumption of loading or discharging operations .

**CLAUSE 36 :**
Any taxes/dues/charges/warfage/dockage on or assessed against vessel/freight/flag/ownership/crew to be for Owners account and same on or assessed against cargo to be for Charterers account .

**CLAUSE 37 :**
Vessel is free of extra insurance due to vessel's age and same to be for Charterers account.

**CLAUSE 38 :**
Dispute arising between owners and charterers shall be referred to three persons in London . One to be appointed by each of the parties hereto and the third by the two so chosen . Their decision or that of any two of them shall be final and for purpose of enforcing any award. This agreement may be a rule of the court . Arbitration in London and English law to apply .

**CLAUSE 39 :**
Owners guarantee that the vessel's hatch cover are in good condition and watertight and vessel's holds are suitable for grap discharge .